# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

### Holding a Criminal Term
### Grand Jury Sworn in on November 16, 2009

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL NO. _____ |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | VIOLATIONS: |
| | : | |
| AMARO GONCALVES, | : | 18 U.S.C. § 371 (Count 1); |
| JOHN M. MUSHRIQUI, | : | Conspiracy to Violate the Foreign |
| JEANA MUSHRIQUI, | : | Corrupt Practices Act |
| JONATHAN M. SPILLER, | : | |
| DAVID PAINTER, | : | 15 U.S.C. §§ 78dd-1, 78dd-2 and 78dd-3 |
| LEE WARES, | : | (Counts 2-43); |
| PANKESH PATEL, | : | Foreign Corrupt Practices Act Violations |
| OFER PAZ, | : | |
| ISRAEL WEISLER, | : | 18 U.S.C. § 1956(h) (Count 44); |
| a/k/a WAYNE WEISLER, | : | Conspiracy to Commit Money Laundering |
| MICHAEL SACKS, | : | |
| JOHN BENSON WIER III, | : | 18 U.S.C. § 2; |
| HAIM GERI, | : | Aiding and Abetting and |
| YOCHANAN R. COHEN, | : | Causing an Act to be Done |
| a/k/a YOCHI COHEN, | : | |
| SAUL MISHKIN, | : | 18 U.S.C. § 982; |
| R. PATRICK CALDWELL, | : | Forfeiture |
| STEPHEN GERARD GIORDANELLA, | : | |
| ANDREW BIGELOW, | : | |
| HELMIE ASHIBLIE, | : | |
| DANIEL ALVIREZ, | : | |
| LEE ALLEN TOLLESON, | : | |
| JOHN GREGORY GODSEY, | : | |
| a/k/a GREG GODSEY, and | : | |
| MARK FREDERICK MORALES, | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

## INDICTMENT

The Grand Jury charges that at all times material to this Indictment:

## INTRODUCTION

1.      The Foreign Corrupt Practices Act of 1977, as amended, 15 U.S.C. §§ 78dd-1, *et seq.* ("FCPA"), prohibited certain classes of persons and entities from making payments to foreign government officials to assist in obtaining or retaining business.  Specifically, the FCPA prohibited the willful use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of money or anything of value to any person, while knowing that all or a portion of such money or thing of value would be offered, given or promised, directly or indirectly, to a foreign official for the purpose of assisting in the obtaining or retaining of business.

2.      AMARO GONCALVES ("GONCALVES") was a citizen of the United States and, as such, was a "domestic concern" as that term was defined in the FCPA.  15 U.S.C. § 78dd-2(h)(1).  GONCALVES was the Vice President of Sales for Company A, a United States company headquartered in Springfield, Massachusetts.  Company A was a world-wide leader in the design and manufacture of firearms, firearm safety/security products, rifles, firearms systems, and accessories.  The shares of Company A were publicly traded on the NASDAQ stock exchange.  Company A was an "issuer," as that term is used in the FCPA, because its shares were registered pursuant to 15 U.S.C. § 78l and because Company A was required to file periodic reports pursuant to 15 U.S.C. § 78o(d).  15 U.S.C. § 78dd-1(a).

3.      JOHN M. MUSHRIQUI was a citizen of the United States and, as such, was a "domestic concern" as that term was defined in the FCPA.  15 U.S.C. § 78dd-2(h)(1).  JOHN M.

MUSHRIQUI was the owner and Director of International Development for Company B, a Pennsylvania company that was in the business of manufacturing and exporting bulletproof vests and other law enforcement and military equipment. Company B's business was located in Upper Darby, Pennsylvania. As a company that maintained its principal place of business in the United States, and that was organized under the laws of a state of the United States, Company B was a "domestic concern" as that term was defined in the FCPA. 15 U.S.C. § 78dd-2(h)(1).

4.     JEANA MUSHRIQUI was a citizen of the United States and, as such, was a "domestic concern" as that term was defined in the FCPA. 15 U.S.C. § 78dd-2(h)(1). JEANA MUSHRIQUI was the General Counsel and United States manager of Company B and the sister of JOHN M. MUSHRIQUI.

5.     JONATHAN M. SPILLER ("SPILLER") was a resident of the United States and, as such, was a "domestic concern" as that term is defined in the FCPA. 15 U.S.C. § 78dd-2(h)(1). SPILLER was the owner and President of Company C-1, a Florida company that was in the business of providing consulting services for companies in the law enforcement and military equipment industries. SPILLER was also the owner and Manager of Company C-2, a Florida company that was in the business of marketing and selling law enforcement and military equipment. Companies C-1 and C-2 were both located in Ponte Vedra Beach, Florida. As companies that maintained their principal places of business in the United States, and that were organized under the laws of a state of the United States, Companies C-1 and C-2 were each a "domestic concern" as that term was defined in the FCPA. 15 U.S.C. § 78dd-2(h)(1).

6.     DAVID PAINTER ("PAINTER") was a citizen of the United Kingdom and, as such, was a "person" other than an issuer or a domestic concern as that term was defined in the

FCPA. 15 U.S.C. § 78dd-3(f)(1). PAINTER was the Chairman of Subsidiary A, a subsidiary of a company based in Cincinnati, Ohio (Company D). Subsidiary A was in the business of marketing armored vehicles. As a company that maintained its place of business in the United Kingdom, Subsidiary A was a "person" other than an issuer or domestic concern as that term was defined in the FCPA. 15 U.S.C. § 78dd-3(f)(1).

7.      LEE WARES ("WARES") was a citizen of the United Kingdom and, as such, was a "person" other than an issuer or a domestic concern as that term was defined in the FCPA. 15 U.S.C. § 78dd-3(f)(1). WARES was the Director of Subsidiary A.

8.      PANKESH PATEL ("PATEL") was a citizen of the United Kingdom and, as such, was a "person" other than an issuer or a domestic concern as that term was defined in the FCPA. 15 U.S.C. § 78dd-3(f)(1). PATEL was the Managing Director of Company E, a United Kingdom company that acted as a sales agent for companies in the law enforcement and military products industries. As a company that maintained its place of business in the United Kingdom, Company E was a "person" other than an issuer or domestic concern as that term was defined in the FCPA. 15 U.S.C. § 78dd-3(f)(1).

9.      OFER PAZ ("PAZ") was a citizen of the State of Israel and, as such, was a "person" other than an issuer or a domestic concern as that term was defined in the FCPA. 15 U.S.C. § 78dd-3(f)(1). PAZ was the President and Chief Executive Officer of Company F, an Israel-based company that acted as a sales agent for companies in the law enforcement and military products industries. As a company that maintained its place of business in Israel, Company F was a "person" other than an issuer or domestic concern as that term was defined in the FCPA. 15 U.S.C. § 78dd-3(f)(1).

10.     ISRAEL WEISLER, a/k/a WAYNE WEISLER ("WEISLER"), was a citizen of the United States and, as such, was a "domestic concern" as that term was defined in the FCPA. 15 U.S.C. § 78dd-2(h)(1).  WEISLER was an owner and Chief Executive Officer of Company G, a Kentucky company that was in the business of designing, manufacturing, and selling armor products, including body armor.  Company G's business was located in Stearns, Kentucky.  As a company that maintained its principal place of business in the United States, and that was organized under the laws of a state of the United States, Company G was a "domestic concern" as that term was defined in the FCPA.  15 U.S.C. § 78dd-2(h)(1).

11.     MICHAEL SACKS ("SACKS") was a citizen of the United Kingdom and, as such, was a "person" other than an issuer or a domestic concern as that term was defined in the FCPA. 15 U.S.C. §§ 78dd-3(f)(1).  SACKS was a co-owner and co-Chief Executive Officer of Company G.

12.     JOHN BENSON WIER III ("WIER") was a citizen of the United States and, as such, was a "domestic concern" as that term was defined in the FCPA.  15 U.S.C. § 78dd-2(h)(1).  WIER was the President of Company H, a Florida company headquartered in St. Petersburg, Florida, that sold tactical and ballistic equipment.  As a company that maintained its principal place of business in the United States, and that was organized under the laws of a state of the United States, Company H was a "domestic concern" as that term was defined in the FCPA.  15 U.S.C. § 78dd-2(h)(1).

13.     HAIM GERI ("GERI") was a citizen of the United States and, as such, was a "domestic concern" as that term was defined in the FCPA.  15 U.S.C. § 78dd-2(h)(1).  GERI was the President of Company I, a company based in North Miami Beach, Florida, that served as a

sales agent for companies in the law enforcement and military products industries.  As a

company that maintained its principal place of business in the United States, and that was

organized under the laws of a state of the United States, Company I was a "domestic concern" as

that term was defined in the FCPA.  15 U.S.C. § 78dd-2(h)(1).

14.    YOCHANAN COHEN, a/k/a YOCHI COHEN ("COHEN"), was a resident of the

United States and, as such, was a "domestic concern" as that term was defined in the FCPA.

15 U.S.C. § 78dd-2(h)(1).  COHEN was the Chief Executive Officer of Company J, a company

based in San Francisco, California, that was in the business of manufacturing security equipment,

including body armor and hard armor ballistic plates.  As a company that maintained its principal

place of business in the United States, and that was organized under the laws of a state of the

United States, Company J was a "domestic concern" as that term was defined in the FCPA.

15 U.S.C. § 78dd-2(h)(1).

15.    SAUL MISHKIN ("MISHKIN") was a resident of the United States and, as such,

was a "domestic concern" as that term was defined in the FCPA.  15 U.S.C. § 78dd-2(h)(1).

MISHKIN was the owner and Chief Executive Officer of Company K, a Florida company

headquartered in Aventura, Florida, that sold law enforcement and military equipment.  As a

company that maintained its principal place of business in the United States, and that was

organized under the laws of a state of the United States, Company K was a "domestic concern"

as that term was defined in the FCPA.  15 U.S.C. § 78dd-2(h)(1).

16.    R. PATRICK CALDWELL ("CALDWELL") was a citizen of the United States

and, as such, was a "domestic concern" as that term was defined in the FCPA.

15 U.S.C. § 78dd-2(h)(1).  From in or about May 2009, through in or about September 2009,

CALDWELL was the Senior Vice President of Sales and Marketing for Company L, a Florida corporation headquartered in Sunrise, Florida, that designed and manufactured concealable and tactical body armor. In or about September 2009, CALDWELL was named Chief Executive Officer of Company L. As a company that maintained its principal place of business in the United States, and that was organized under the laws of a state of the United States, Company L was a "domestic concern" as that term was defined in the FCPA. 15 U.S.C. § 78dd-2(h)(1).

17.    STEPHEN GERARD GIORDANELLA ("GIORDANELLA") was a citizen of the United States and, as such, was a "domestic concern" as that term was defined in the FCPA. 15 U.S.C. § 78dd-2(h)(1). GIORDANELLA was the Chief Executive Officer of Company L until his resignation on or about March 18, 2009. From on or about March 18, 2009, through at least December 2, 2009, GIORDANELLA was a "consultant" to Company L.

18.    ANDREW BIGELOW ("BIGELOW") was a citizen of the United States and, as such, was a "domestic concern" as that term was defined in the FCPA. 15 U.S.C. § 78dd-2(h)(1). BIGELOW was the Managing Partner and Director of Government Programs for Company M, a company that was based in Sarasota, Florida, and was in the business of selling machine guns, grenade launchers, and other small arms and accessories. As a company that maintained its principal place of business in the United States, and that was organized under the laws of a state of the United States, Company M was a "domestic concern" as that term was defined in the FCPA. 15 U.S.C. § 78dd-2(h)(1).

19.    HELMIE ASHIBLIE ("ASHIBLIE") was a citizen of the United States and, as such, was a "domestic concern" as that term was defined in the FCPA. 15 U.S.C. § 78dd-2(h)(1). ASHIBLIE was Vice President and Founder of Company N, a company that was based

in Woodbridge, Virginia, and was in the business of supplying tactical bags and other security-related articles for law enforcement agencies and governments worldwide. As a company that maintained its principal place of business in the United States, and that was organized under the laws of a state of the United States, Company N was a "domestic concern" as that term was defined in the FCPA. 15 U.S.C. § 78dd-2(h)(1).

20.    DANIEL ALVIREZ ("ALVIREZ") was a citizen of the United States and, as such, was a "domestic concern" as that term was defined in the FCPA. 15 U.S.C. § 78dd-2(h)(1). ALVIREZ was the President of Company O, an Arkansas company based in Bull Shoals, Arkansas, that manufactured and sold law enforcement and military equipment. As a company that maintained its principal place of business in the United States, and that was organized under the laws of a state of the United States, Company O was a "domestic concern" as that term was defined in the FCPA. 15 U.S.C. § 78dd-2(h)(1).

21.    LEE ALLEN TOLLESON ("TOLLESON") was a citizen of the United States and, as such, was a "domestic concern" as that term was defined in the FCPA. 15 U.S.C. § 78dd-2(h)(1). TOLLESON was the Director of Acquisitions and Logistics for Company O.

22.    JOHN GREGORY GODSEY, a/k/a GREG GODSEY ("GODSEY"), was a citizen of the United States and, as such, was a "domestic concern" as that term was defined in the FCPA. 15 U.S.C. § 78dd-2(h)(1). GODSEY was the owner of Company P, a Georgia company based in Decatur, Georgia, that was in the business of selling ammunition and other law enforcement and military equipment. As a company that maintained its principal place of business in the United States, and that was organized under the laws of a state of the United

States, Company P was a "domestic concern" as that term was defined in the FCPA. 15 U.S.C. § 78dd-2(h)(1).

23.    MARK FREDERICK MORALES ("MORALES") was a citizen of the United States and, as such, was a "domestic concern" as that term was defined in the FCPA. 15 U.S.C. § 78dd-2(h)(1).   MORALES was a business associate of GODSEY and worked with him on deals involving Company P.

24.    Individual 1 was the former Vice President of International Sales for a company that manufactured and supplied law enforcement and military equipment to law enforcement and military customers around the world and was a business associate of GONCALVES, JOHN M. MUSHRIQUI, JEANA MUSHRIQUI, PAINTER, WARES, PATEL, PAZ, WEISLER, SACKS, WIER, GERI, COHEN, MISHKIN, CALDWELL, GIORDANELLA, BIGELOW, ASHIBLIE, ALVIREZ, TOLLESON, GODSEY, MORALES, and SPILLER.

25.    "Pascal Latour" ("Latour") was an undercover Special Agent with the Federal Bureau of Investigation ("FBI") posing as a representative of the Minister of Defense of a country in Africa ("Country A").

26.    "Jean-Pierre Mahmadou" ("Mahmadou") was an undercover Special Agent with the FBI posing as a procurement officer for Country A's Ministry of Defense who purportedly reported directly to the Minister of Defense.

## COUNT 1
### (Conspiracy to Violate the Foreign Corrupt Practices Act)

27.    Paragraphs 1 through 26 of the Indictment are realleged and incorporated by reference as if fully set forth herein.

28.    From in or about May 2009, through in or about January 2010, in the District of Columbia, and elsewhere, the defendants,

AMARO GONCALVES, JOHN M. MUSHRIQUI, JEANA MUSHRIQUI,
DAVID PAINTER, LEE WARES, PANKESH PATEL, OFER PAZ,
WAYNE WEISLER, MICHAEL SACKS, JOHN WIER, HAIM GERI,
YOCHI COHEN, SAUL MISHKIN, R. PATRICK CALDWELL,
STEPHEN GIORDANELLA, ANDREW BIGELOW, HELMIE ASHIBLIE,
DANIEL ALVIREZ, LEE TOLLESON, GREG GODSEY, MARK MORALES, and
JONATHAN SPILLER,

and others known and unknown to the Grand Jury, did unlawfully, willfully, and knowingly conspire, confederate and agree together and with each other and others to commit offenses against the United States, that is, to willfully use the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and the authorization of the payment of any money, and offer, give, promise to give, and authorizing of the giving of anything of value to any foreign official and any person, while knowing that a portion of such money or thing of value will be offered, given, promised, directly or indirectly, to any foreign official for purposes of: (i) influencing the acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duties of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and instrumentalities thereof to affect and influence acts and decisions of such government and instrumentalities thereof, in order

to assist themselves, their associated companies, and their conspirators in obtaining and retaining business, in violation of the FCPA, Title 15, United States Code, Sections 78dd-1(a), 78dd-2(a), and 78dd-3(a).

Object of the Conspiracy

29.    The object of the conspiracy was for the defendants to unlawfully enrich themselves, their associated companies, and their conspirators by making corrupt payments and attempting to make corrupt payments to foreign officials for the purpose of obtaining and retaining business opportunities.

Manner and Means of the Conspiracy

30.    The manner and means by which the defendants and their conspirators accomplished the object of the conspiracy included, but were not limited to, the following:

a.    Individual 1 would discuss with ALVIREZ the names of companies and individuals that would participate in a $15 million deal to outfit Country A's Presidential Guard with various types of military-related products (the "Country A Deal"). Individual 1 and ALVIREZ would agree that Individual 1 would split with ALVIREZ the commissions Individual 1 would receive in connection with the Country A Deal.

b.    The defendants would participate in meetings and have discussions in which Individual 1 or Latour explained that Latour was a self-employed sales agent tasked by Country A's Minister of Defense with obtaining approximately $15 million of various defense articles from various suppliers for the purpose of outfitting Country A's Presidential Guard and that Individual 1 was brokering the deal.

11

c.     The defendants would agree to pay Latour a 20% "commission" - - totaling $3 million - - in connection with the $15 million Country A Deal, believing that half of the "commission" would be paid as a bribe to the Minister of Defense of Country A and the other half would be split between Individual 1 and Latour as a fee for their corrupt services.

d.     The defendants would agree that the Country A Deal would proceed in two phases. The first phase would involve the sale of a small quantity of products to the Ministry of Defense of Country A ("Phase One") to demonstrate the quality of the products and to show that the "commission" would in fact be paid to the Minister of Defense. The second phase would involve a second, larger contract to supply additional products to the Ministry of Defense of Country A ("Phase Two").

e.     The defendants would agree that the products they would supply in connection with Phase One would be consolidated for shipment to Country A.

f.     The defendants would agree to inflate by 20% the price of the products they would sell in the Country A Deal for the purpose of obtaining money to fund the corrupt payments.

g.     The defendants would agree to create two price quotations, with one quotation representing the true price of the products and the second, inflated quotation representing the true price of the products plus the 20% "commission."

h.     The defendants would pay a "commission" into Latour's bank account in the United States in connection with Phase One, believing that half of the "commission" was intended to be paid outside the United States as a bribe to the Minister of Defense of Country A, for the purposes of obtaining the Phase One and Phase Two contracts.

12

i.     The defendants would agree to pay a "commission" to Latour in the United States in connection with the Phase Two contract, believing that approximately half of the "commission" was intended to be paid outside the United States as a bribe to the Minister of Defense of Country A, for the purpose of obtaining the Phase Two contract.

j.     PAINTER and WARES would agree to sell armored vehicles in Phase Two through SPILLER's company (Company C-1), rather than directly from Subsidiary A, so that PAINTER and WARES could make more money on Phase Two.

k.     GODSEY, MORALES and ALVIREZ would agree that GODSEY and MORALES would purchase the ammunition they agreed to sell to Country A from ALVIREZ's company (Company O) so that GODSEY, MORALES, and Company O could make more money on the Country A Deal.

l.     PAINTER, WARES, PATEL, PAZ, WEISLER, SACKS, WIER, GERI, COHEN, MISHKIN, CALDWELL, BIGELOW, ASHIBLIE, ALVIREZ, TOLLESON, GODSEY, and MORALES would attend a cocktail reception at Clyde's, a restaurant in Washington, D.C., to celebrate the completion of Phase One and to meet with Mahmadou to discuss Phase Two. At that reception, Individual 1 delivered a speech discussing the Country A Deal and introduced Mahmadou as the Deputy Procurement Official for the Ministry of Defense of Country A. Mahmadou also delivered a speech and, among other statements, thanked the attendees for "these products which you have all brought to the military of [Country A], in support of our equipment enhancement program and for the Republican Guard."

m.     PAINTER, WARES, PATEL, PAZ, WEISLER, SACKS, WIER, GERI, COHEN, MISHKIN, CALDWELL, BIGELOW, ASHIBLIE, ALVIREZ, TOLLESON, GODSEY, and MORALES would meet in small groups with Individual 1 and Mahmadou during the cocktail reception at Clyde's, at which time they were thanked for the "commission" they had paid to the Minister of Defense in connection with Phase One, and they would be provided with copies of the purchase agreement for the corrupt Phase Two deal.

n.     JOHN M. MUSHRIQUI, JEANA MUSHRIQUI, GONCALVES, and SPILLER would meet with or have conversations with Individual 1 and Mahmadou during which Mahmadou would thank them for the "commission" they had paid to the Minister of Defense in connection with Phase One, and would be provided, at that meeting or shortly thereafter, with copies of the purchase agreement for the corrupt Phase Two deal.

o.     GONCALVES, JOHN M. MUSHRIQUI, JEANA MUSHRIQUI, PAINTER, WARES, PATEL, PAZ, WEISLER, SACKS, WIER, GERI, COHEN, MISHKIN, CALDWELL, BIGELOW, ASHIBLIE, ALVIREZ, TOLLESON, GODSEY, MORALES, and SPILLER would travel to Las Vegas, Nevada, for the purpose of attending a meeting between the suppliers in the Country A Deal and the new Minister of Defense of Country A, at which time the suppliers expected to receive payment amounting to 60% of the inflated sales price of the products to be sold in Phase Two.

14

<u>Overt Acts</u>

31.    Within the District of Columbia, and elsewhere, in furtherance of the above described conspiracy and in order to carry out the object thereof, the defendants and others known and unknown to the Grand Jury, committed the following overt acts, among others:

a.    As set forth below, the defendants met and/or spoke with Individual 1 and Latour about the Country A Deal:

| Overt Act | Defendant(s) | On or About Date | Location |
|---|---|---|---|
| (1) | GONCALVES | May 21, 2009 | Washington, D.C. |
| (2) | JOHN M. MUSHRIQUI and JEANA MUSHRIQUI | May 22, 2009 | Meeting in Washington, D.C. JOHN M. MUSHRIQUI participated by telephone. |
| (3) | WARES | May 20, 2009 | Washington, D.C. |
| (4) | PAINTER and WARES | May 26, 2009 | Telephone call |
| (5) | PATEL | May 13, 2009 | Miami, Florida |
| (6) | PAZ | May 21, 2009 | Washington, D.C. |
| (7) | WEISLER and SACKS | May 21, 2009 | Meeting in Washington, D.C. SACKS participated by Skype. |
| (8) | WIER | May 14, 2009 | Miami, Florida |
| (9) | GERI | May 14, 2009 | Miami, Florida |
| (10) | COHEN | May 22, 2009 | Washington, D.C. |
| (11) | MISHKIN | May 15, 2009 | Telephone call |
| (12) | CALDWELL and GIORDANELLA | May 14, 2009 | Miami, Florida |
| (13) | BIGELOW | May 14, 2009 | Miami, Florida |
| (14) | ASHIBLIE | August 25, 2009 | Washington, D.C. |
| (15) | ALVIREZ and TOLLESON | May 13, 2009 | Miami, Florida |
| (16) | GODSEY and MORALES | May 13, 2009 | Miami, Florida |
| (17) | SPILLER | May 13, 2009 | Miami, Florida |

b.    As set forth below, the defendants caused emails to be sent to Individual 1 and Latour attaching true and/or inflated price quotations in connection with the Country A Deal:

| Overt Act | Defendant(s) | On or About Date | Product | Quotation |
|-----------|--------------|------------------|---------|-----------|
| (1) | GONCALVES | May 26, 2009 | Pistols | Phases One and Two True Prices |
| (2) | GONCALVES | May 28, 2009 | Pistols | Phase One Inflated Price |
| (3) | GONCALVES | September 14, 2009 | Pistols | Phase Two Inflated Price |
| (4) | JOHN M. MUSHRIQUI and JEANA MUSHRIQUI | June 1, 2009 | Bulletproof Vests | Phases One True and Inflated Prices |
| (5) | JOHN M. MUSHRIQUI and JEANA MUSHRIQUI | September 16, 2009 | Bulletproof Vests | Phase Two Inflated Price |
| (6) | PAINTER and WARES | June 4, 2009 | Night Vision Goggles | Phase One True and Inflated Prices |
| (7) | PAINTER and WARES | September 3, 2009 | Armored Vehicles | Phase Two True and Inflated Prices |
| (8) | PATEL | May 28, 2009 | Uniforms | Phase One Inflated Price |
| (9) | PATEL | June 23, 2009 | Uniforms | Phase One True Price |
| (10) | PATEL | September 22, 2009 | Uniforms | Phase Two True and Inflated Prices |
| (11) | PAZ | May 25, 2009 | Explosives Detection Kits | Phase One True and Inflated Prices |
| (12) | PAZ | September 14, 2009 | Explosives Detection Kits | Phase Two True and Inflated Prices |
| (13) | WEISLER and SACKS | May 27, 2009 | Body Armor | Phases One and Two True and Inflated Prices |
| (14) | WIER | May 15, 2009 | Laser Grips | Phase Two Inflated Price |
| (15) | WIER | May 18, 2009 | Laser Grips | Phase One Inflated Price |
| (16) | WIER | May 18, 2009 | Laser Grips | Phase One True Price |
| (17) | WIER | May 18, 2009 | Laser Grips | Phase Two True Price |
| (18) | GERI | May 15, 2009 | Corner Shot | Phase One Inflated Price |
| (19) | GERI | May 15, 2009 | Corner Shot | Phase Two Inflated Price |
| (20) | GERI | May 16, 2009 | Corner Shot | Phases One and Two True Prices |

| Overt Act | Defendant(s) | On or About Date | Product | Quotation |
|---|---|---|---|---|
| (21) | COHEN | June 2, 2009 | Ballistic Plates | Phases One and Two True and Inflated Prices |
| (22) | MISHKIN | May 21, 2009 | Riot Control Suits | Phase One Inflated Price |
| (23) | MISHKIN | June 24, 2009 | Riot Control Suits | Phase One True Price |
| (24) | MISHKIN | July 7, 2009 | Riot Control Suits | Phase One True Price |
| (25) | MISHKIN | September 9, 2009 | Meals, Ready to Eat | Phase Two True Price |
| (26) | MISHKIN | September 10, 2009 | Meals, Ready to Eat | Phase Two Inflated Price |
| (27) | MISHKIN | September 12, 2009 | Riot Control Suits | Phase Two True Price |
| (28) | CALDWELL and GIORDANELLA | May 18, 2009 | Body Armor Plates | Phase One Inflated Price |
| (29) | CALDWELL and GIORDANELLA | May 18, 2009 | Body Armor Plates | Phases One and Two True Prices |
| (30) | CALDWELL | September 17, 2009 | Body Armor Plates | Phase Two Inflated Price |
| (31) | BIGELOW | May 18, 2009 | M4 Rifles | Phases One and Two True and Inflated Prices |
| (32) | ASHIBLIE | August 27, 2009 | Tactical Bags | Phases One and Two True and Inflated Prices |
| (33) | ALVIREZ and TOLLESON | May 13, 2009 | Grenade Launchers | Phase One True Price |
| (34) | ALVIREZ and TOLLESON | May 13, 2009 | Grenades | Phase Two True Price |
| (35) | ALVIREZ and TOLLESON | May 18, 2009 | Grenade Launchers | Phase One Inflated Price |
| (36) | ALVIREZ and TOLLESON | September 11, 2009 | Grenades | Phase Two Inflated Price |
| (37) | GODSEY and MORALES | May 20, 2009 | Ammunition | Phase One Inflated Price |
| (38) | GODSEY and MORALES | May 26, 2009 | Ammunition | Phases One and Two True Prices |
| (39) | GODSEY and MORALES | September 21, 2009 | Ammunition | Phase Two Inflated Price |
| (40) | SPILLER | May 18, 2009 | Rifle-Mounted Cameras | Phase One True and Inflated Prices |
| (41) | SPILLER | September 3, 2009 | Tactical Vehicles | Phase Two True and Inflated Prices |

      c.     As set forth below, the defendants caused to be notified Individual 1 and

Latour that the products sold in connection with Phase One had been shipped:

| Overt Act | Defendant(s) | On or About Date | Communication |
|---|---|---|---|
| (1) | GONCALVES | August 21, 2009 | Email |
| (2) | JOHN M. MUSHRIQUI and JEANA MUSHRIQUI | July 13, 2009 | Email |
| (3) | PAINTER and WARES | August 31, 2009 | Email |
| (4) | PATEL | August 13, 2009 | Email |
| (5) | PAZ | June 25, 2009 | Email |
| (6) | WEISLER and SACKS | July 2, 2009 | Email |
| (7) | WIER | June 30, 2009 | Email |
| (8) | GERI | July 29, 2009 | Email |
| (9) | COHEN | August 10, 2009 | Email |
| (10) | MISHKIN | August 11, 2009 | Email |
| (11) | CALDWELL | July 16, 2009 | Email |
| (12) | BIGELOW | August 25, 2009 | Email |
| (13) | ASHIBLIE | September 21, 2009 | Email |
| (14) | ALVIREZ and TOLLESON | August 21, 2009 | Telephone call |
| (15) | GODSEY and MORALES | August 17, 2009 | Email |
| (16) | SPILLER | July 2, 2009 | Meeting |

      d.     As set forth below, on or about June 17, 2009, the defendants caused to be

sent wire transfers from a bank account purported to be controlled by Country A:

| Overt Act | Defendant(s) | Approximate Payment for Phase One |
|---|---|---|
| (1) | GONCALVES | $12,495.34 |
| (2) | JOHN M. MUSHRIQUI and JEANA MUSHRIQUI | $13,450.00 |
| (3) | PAINTER and WARES | $12,183.60 |
| (4) | PATEL | $7,245.50 |
| (5) | PAZ | $9,650.00 |

| Overt Act | Defendant(s) | Approximate Payment for Phase One |
|---|---|---|
| (6) | WEISLER and SACKS | $10,500.00 |
| (7) | WIER | $7,289.00 |
| (8) | GERI | $12,190.00 |
| (9) | COHEN | $9,000.00 |
| (10) | MISHKIN | $11,945.34 |
| (11) | CALDWELL and GIORDANELLA | $18,000.00 |
| (12) | BIGELOW | $17,004.00 |
| (13) | ASHIBLIE | $2,261.00 |
| (14) | ALVIREZ and TOLLESON | $16,231.50 |
| (15) | GODSEY and MORALES | $14,400.00 |
| (16) | SPILLER | $12,792.38 |

      e.     As set forth below, the defendants caused to be sent wire transfers of the

20% "commission" to Latour's bank account:

| Overt Act | Defendant(s) | On or about Date | "Commission" Amount |
|---|---|---|---|
| (1) | GONCALVES | August 27, 2009 | $2,280.00 |
| (2) | JOHN M. MUSHRIQUI and JEANA MUSHRIQUI | June 25, 2009 | $2,200.00 |
| (3) | PAINTER and WARES | August 28, 2009 | $2,030.60 |
| (4) | PATEL | August 12, 2009 | $1,000.00 |
| (5) | PAZ | July 9, 2009 | $1,513.00 |
| (6) | WEISLER and SACKS | June 18, 2009 | $1,750.00 |
| (7) | WIER | June 30, 2009 | $1,200.00 |
| (8) | GERI | June 26, 2009 | $2,000.00 |
| (9) | COHEN | July 10, 2009 | $1,500.00 |
| (10) | CALDWELL | August 11, 2009 | $3,000.00 |
| (11) | BIGELOW | September 3, 2009 | $2,834.00 |
| (12) | ASHIBLIE | September 3, 2009 | $351.00 |

| Overt Act | Defendant(s) | On or about Date | "Commission" Amount |
|-----------|--------------|------------------|---------------------|
| (13) | ALVIREZ and TOLLESON | June 19, 2009 | $2,705.50 |
| (14) | GODSEY and MORALES | August 17, 2009 | $2,400.00 |
| (15) | SPILLER | July 2, 2009 | $2,131.99 |

f.      As set forth below, the defendants met with Individual 1, Mahmadou and other participants in the Country A Deal at a celebratory reception for the participants in the Country A Deal at Clyde's, a restaurant in Washington, D.C.:

| Overt Act | Defendant(s) | On or About Date | Location |
|-----------|--------------|------------------|----------|
| (1) | PAINTER and WARES | October 5, 2009 | Clyde's, Washington, D.C. |
| (2) | PATEL | October 5, 2009 | Clyde's, Washington, D.C. |
| (3) | PAZ | October 5, 2009 | Clyde's, Washington, D.C. |
| (4) | WEISLER and SACKS | October 5, 2009 | Clyde's, Washington, D.C. |
| (5) | WIER | October 5, 2009 | Clyde's, Washington, D.C. |
| (6) | GERI | October 5, 2009 | Clyde's, Washington, D.C. |
| (7) | COHEN | October 5, 2009 | Clyde's, Washington, D.C. |
| (8) | MISHKIN | October 5, 2009 | Clyde's, Washington, D.C. |
| (9) | CALDWELL | October 5, 2009 | Clyde's, Washington, D.C. |
| (10) | BIGELOW | October 5, 2009 | Clyde's, Washington, D.C. |
| (11) | ASHIBLIE | October 5, 2009 | Clyde's, Washington, D.C. |
| (12) | ALVIREZ and TOLLESON | October 5, 2009 | Clyde's, Washington, D.C. |
| (13) | GODSEY and MORALES | October 5, 2009 | Clyde's, Washington, D.C. |

g.      On or about October 5, 2009, SPILLER had a telephone conversation with Individual 1 and Mahmadou, who were both located in Washington, D.C., about the Country A Deal.

h.      On or about October 6, 2009, GONCALVES met with Individual 1 and Mahmadou at Degrees Bar & Lounge in Washington, D.C. and discussed the Country A Deal.

20

   i.  On or about October 6, 2009, JEANA MUSHRIQUI met with Individual 1 and Mahmadou at the Ritz-Carlton Hotel in Washington, D.C., with JOHN M. MUSHRIQUI participating by telephone, and discussed the Country A Deal.

   j.  As set forth below, the defendants caused to be sent by interstate carrier original, executed copies of the purchase agreement for the corrupt Phase Two deal:

| Overt Act | Defendant(s) | On or About Date | From | To |
|---|---|---|---|---|
| (1) | GONCALVES | October 13, 2009 | Springfield, Massachusetts | Washington, D.C. |
| (2) | JOHN M. MUSHRIQUI and JEANA MUSHRIQUI | November 2, 2009 | Upper Darby, Pennsylvania | Washington, D.C. |
| (3) | PAINTER and WARES | October 30, 2009 | Ponte Vedra Beach, Florida | Washington, D.C. |
| (4) | PATEL | October 13, 2009 | United Kingdom | Washington, D.C. |
| (5) | PAZ | October 20, 2009 | Kfar Saba, Israel | Washington, D.C. |
| (5) | WEISLER and SACKS | October 12, 2009 | Radcliff, Kentucky | Washington, D.C. |
| (6) | WIER | October 9, 2009 | St. Petersburg, Florida | Washington, D.C. |
| (7) | GERI | October 13, 2009 | North Miami Beach, Florida | Washington, D.C. |
| (8) | COHEN | October 12, 2009 | San Francisco, California | Washington, D.C. |
| (9) | CALDWELL | October 9, 2009 | Sunrise, Florida | Washington, D.C. |
| (10) | BIGELOW | October 8, 2009 | Sarasota, Florida | Washington, D.C. |
| (11) | ASHIBLIE | October 28, 2009 | Woodbridge, Virginia | Washington, D.C. |
| (12) | ALVIREZ and TOLLESON | October 23, 2009 | Bull Shoals, Arkansas | Washington, D.C. |
| (13) | GODSEY and MORALES | October 22, 2009 | Atlanta, Georgia | Washington, D.C. |
| (14) | SPILLER | October 30, 2009 | Ponte Vedra Beach, Florida | Washington, D.C. |

k.      On or about October 6, 2009, in Washington, D.C., MISHKIN hand delivered to Individual 1 one original executed copy of the purchase agreement for the Meals, Ready to Eat that MISHKIN was selling in connection with the corrupt Phase Two deal.

l.      On or around December 2, 2009, GIORDANELLA had a telephone conversation with Individual 1 during which GIORDANELLA and Individual 1 discussed the possibility of GIORDANELLA traveling to Las Vegas, Nevada in connection with the Country A Deal.

m.      On or about January 17, 2010, GONCALVES, JEANA MUSHRIQUI, JOHN M. MUSHRIQUI, PAINTER, WARES, PATEL, PAZ, WEISLER, SACKS, WIER, GERI, COHEN, MISHKIN, CALDWELL, BIGELOW, ASHIBLIE, ALVIREZ, TOLLESON, GODSEY, MORALES, and SPILLER traveled to Las Vegas, Nevada in connection with the Country A Deal.

**(Conspiracy to Violate the Foreign Corrupt Practices Act, in violation of Title 18, United States Code, Section 371)**

## COUNTS 2 - 43
### (Foreign Corrupt Practices Act Violations)

32.    Paragraphs 1 through 26 and 29 through 31 of the Indictment are realleged and incorporated by reference as if set out in full herein.

33.    On or about the dates set forth below, in the District of Columbia, and elsewhere, the defendants,

AMARO GONCALVES, JEANA MUSHRIQUI, JOHN M. MUSHRIQUI,
DAVID PAINTER, LEE WARES, PANKESH PATEL, OFER PAZ,
WAYNE WEISLER, MICHAEL SACKS, JOHN WIER, HAIM GERI,
YOCHI COHEN, SAUL MISHKIN, R. PATRICK CALDWELL,
STEPHEN GIORDANELLA, ANDREW BIGELOW, HELMIE ASHIBLIE,
DANIEL ALVIREZ, LEE TOLLESON, GREG GODSEY, MARK MORALES, and
JONATHAN SPILLER,

and others known and unknown to the Grand Jury, willfully made use of, and aided, abetted, and caused others to make use of, the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and the authorization of the payment of any money, and offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official or to any person, while knowing that all or a portion of such money or thing of value would be offered, given or promised, directly or indirectly, to a foreign official for the purposes of: (i) influencing the acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duties of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and instrumentalities thereof to affect and influence acts and decisions of such government and instrumentalities thereof, in order

to assist themselves, their associated companies, and their conspirators in obtaining and retaining

business in violation of the FCPA as follows:

| Count | Defendant(s) | On or About Date | Means and Instrumentalities of Interstate Commerce |
|---|---|---|---|
| 2 | GONCALVES | May 21, 2009 | Travel from outside Washington, D.C., to Washington, D.C., for the purpose of meeting with Individual 1 and Latour at the Ritz-Carlton hotel to discuss the corrupt Country A Deal |
| 3 | GONCALVES | October 6, 2009 | Travel from outside Washington, D.C., to Washington, D.C., for the purpose of meeting with Individual 1 and Mahmadou at Degrees Bar & Lounge to discuss the corrupt Country A Deal |
| 4 | GONCALVES | October 13, 2009 | Federal Express from Springfield, Massachusetts, to Washington, D.C., containing one original copy of the corrupt purchase agreement for Phase Two |
| 5 | JOHN M. MUSHRIQUI JEANA MUSHRIQUI | May 22, 2009 | Travel from outside Washington, D.C., to Washington, D.C., for the purpose of meeting with Individual 1 and Latour at the Ritz-Carlton hotel to discuss the corrupt Country A Deal |
| 6 | JOHN M. MUSHRIQUI JEANA MUSHRIQUI | May 22, 2009 | Phone call from Washington, D.C., to outside of Washington, D.C., for the purpose of discussing the corrupt Country A Deal |
| 7 | JOHN M. MUSHRIQUI JEANA MUSHRIQUI | October 6, 2009 | Travel from outside Washington, D.C., to Washington, D.C., for the purpose of meeting with Individual 1 and Mahmadou at the Ritz-Carlton Hotel to discuss the corrupt Country A Deal |
| 8 | JOHN M. MUSHRIQUI JEANA MUSHRIQUI | October 6, 2009 | Phone call from outside Washington, D.C., to Washington, D.C., for the purpose of discussing the corrupt Country A Deal |
| 9 | JOHN M. MUSHRIQUI JEANA MUSHRIQUI | November 2, 2009 | Federal Express from Upper Darby, Pennsylvania, to Washington, D.C., containing one original copy of the purchase agreement for the corrupt Phase Two deal |
| 10 | PAINTER WARES | May 20, 2009 | Travel from outside Washington, D.C., to Washington, D.C., for the purpose of meeting with Individual 1 and Latour at the Ritz-Carlton hotel to discuss the corrupt Country A Deal |
| 11 | PAINTER WARES | October 5, 2009 | Travel from outside Washington, D.C., to Washington, D.C., for the purpose of meeting with Individual 1 and Mahmadou at the Ritz-Carlton hotel to discuss the corrupt Country A Deal |

| Count | Defendant(s) | On or About Date | Means and Instrumentalities of Interstate Commerce |
|---|---|---|---|
| 12 | PAINTER WARES | October 30, 2009 | Federal Express from Ponte Vedra Beach, Florida, to Washington, D.C., containing one original copy of the purchase agreement for the corrupt Phase Two deal |
| 13 | PATEL | October 5, 2009 | Travel from outside Washington, D.C., to Washington, D.C., for the purpose of meeting with Individual 1 and Mahmadou at Clyde's to discuss the corrupt Country A Deal |
| 14 | PATEL | October 13, 2009 | DHL from the United Kingdom to Washington, D.C., containing one original copy of the purchase agreement for the corrupt Phase Two deal |
| 15 | PAZ | May 21, 2009 | Travel from outside Washington, D.C., to Washington, D.C., for the purpose of meeting with Individual 1 and Mahmadou at the Ritz-Carlton hotel to discuss the corrupt Country A Deal |
| 16 | PAZ | October 5, 2009 | Travel from outside Washington, D.C., to Washington, D.C., for the purpose of meeting with Individual 1 and Mahmadou at Clyde's to discuss the corrupt Country A Deal |
| 17 | PAZ | October 20, 2009 | Federal Express from Kfar Saba, Israel, to Washington, D.C., containing one original copy of the purchase agreement for the corrupt Phase Two deal |
| 18 | WEISLER SACKS | May 21, 2009 | Travel from outside Washington, D.C., to Washington, D.C., for the purpose of meeting with Individual 1 and Latour at the Ritz-Carlton hotel to discuss the corrupt Country A Deal |
| 19 | WEISLER SACKS | May 21, 2009 | Skype call from Washington, D.C., to outside of Washington, D.C., for the purpose of discussing the corrupt Country A Deal |
| 20 | WEISLER SACKS | October 5, 2009 | Travel from outside Washington, D.C., to Washington, D.C., for the purpose of meeting with Individual 1 and Mahmadou at Clyde's to discuss the corrupt Country A Deal |
| 21 | WEISLER SACKS | October 12, 2009 | Federal Express from Radcliff, Kentucky, to Washington, D.C., containing one original copy of the purchase agreement for the corrupt Phase Two deal |
| 22 | WIER | October 5, 2009 | Travel from outside Washington, D.C., to Washington, D.C., for the purpose of meeting with Individual 1 and Mahmadou at Clyde's to discuss the corrupt Country A Deal |

| Count | Defendant(s) | On or About Date | Means and Instrumentalities of Interstate Commerce |
|---|---|---|---|
| 23 | WIER | October 9, 2009 | UPS from St. Petersburg, Florida, to Washington, D.C., containing one original copy of the purchase agreement for the corrupt Phase Two deal |
| 24 | GERI | October 5, 2009 | Travel from outside Washington, D.C., to Washington, D.C., for the purpose of meeting with Individual 1 and Mahmadou at Clyde's to discuss the corrupt Country A Deal |
| 25 | GERI | October 13, 2009 | Federal Express from North Miami Beach, Florida, to Washington, D.C., containing one original copy of the purchase agreement for the corrupt Phase Two deal |
| 26 | COHEN | May 22, 2009 | Travel from outside Washington, D.C., to Washington, D.C., for the purpose of meeting with Individual 1 and Mahmadou at the Ritz-Carlton hotel to discuss the corrupt Country A Deal |
| 27 | COHEN | October 5, 2009 | Travel from outside Washington, D.C., to Washington, D.C., for the purpose of meeting with Individual 1 and Mahmadou at Clyde's to discuss the corrupt Country A Deal |
| 28 | COHEN | October 12, 2009 | Federal Express from San Francisco, California, to Washington, D.C., containing one original copy of the purchase agreement for the corrupt Phase Two deal |
| 29 | MISHKIN | October 5, 2009 | Travel from outside Washington, D.C., to Washington, D.C., for the purpose of meeting with Individual 1 and Mahmadou at Clyde's to discuss the corrupt Country A Deal |
| 30 | CALDWELL | October 5, 2009 | Travel from outside Washington, D.C., to Washington, D.C., for the purpose of meeting with Individual 1 and Mahmadou at Clyde's to discuss the corrupt Country A Deal |
| 31 | CALDWELL | October 9, 2009 | Federal Express from Sunrise, Florida, to Washington, D.C., containing one original copy of the purchase agreement for the corrupt Phase Two deal |
| 32 | BIGELOW | October 5, 2009 | Travel from outside Washington, D.C., to Washington, D.C., for the purpose of meeting with Individual 1 and Mahmadou at Clyde's to discuss the corrupt Country A Deal |
| 33 | BIGELOW | October 8, 2009 | U.S. Postal Service Priority Mail from Sarasota, Florida, to Washington, D.C., containing one original copy of the purchase agreement for the corrupt Phase Two deal |

| Count | Defendant(s) | On or About Date | Means and Instrumentalities of Interstate Commerce |
|---|---|---|---|
| 34 | ASHIBLIE | August 25, 2009 | Travel from outside Washington, D.C., to Washington, D.C., for the purpose of meeting with Individual 1 at Zaytinya restaurant to discuss the corrupt Country A Deal |
| 35 | ASHIBLIE | October 5, 2009 | Travel from outside Washington, D.C., to Washington, D.C., for the purpose of meeting with Individual 1 and Mahmadou at Clyde's to discuss the corrupt Country A Deal |
| 36 | ASHIBLIE | October 28, 2009 | U.S. Postal Service Priority Mail from Woodbridge, Virginia, to Washington, D.C., containing one original copy of the purchase agreement for the corrupt Phase Two deal |
| 37 | ASHIBLIE | November 4, 2009 | Federal Express from Woodbridge, Virginia, to Washington, D.C., containing thirteen tactical bags |
| 38 | ALVIREZ TOLLESON | October 5, 2009 | Travel from outside Washington, D.C., to Washington, D.C., for the purpose of meeting with Individual 1 and Mahmadou at Clyde's to discuss the corrupt Country A Deal |
| 39 | ALVIREZ TOLLESON | October 23, 2009 | U.S. mail from Bull Shoals, Arkansas, to Washington, D.C., containing two original copies of the purchase agreement for the corrupt Phase Two deal |
| 40 | GODSEY MORALES | October 5, 2009 | Travel from outside Washington, D.C., to Washington, D.C., for the purpose of meeting with Individual 1 and Mahmadou at Clyde's to discuss the corrupt Country A Deal |
| 41 | GODSEY MORALES | October 22, 2009 | U.S. mail from Atlanta, Georgia, to Washington, D.C., containing two original copies of the purchase agreement for the corrupt Phase Two deal |
| 42 | SPILLER | October 5, 2009 | Phone call from outside of Washington, D.C., to Washington, D.C., for the purpose of discussing the corrupt Country A Deal |
| 43 | SPILLER | October 30, 2009 | Federal Express from Ponte Vedra Beach, Florida, to Washington, D.C., containing one original copy of the purchase agreement for the corrupt Phase Two deal |

**(Foreign Corrupt Practices Act Violations and Aiding and Abetting and Causing an Act to be Done, in violation of Title 15, United States Code, Sections 78dd-1(a), 78dd-2(a), 78dd-3(a) and Title 18, United States Code, Section 2)**

## COUNT 44
### (Conspiracy to Commit Money Laundering)

34.    Paragraphs 1 through 26 and 29 through 31 the Indictment are realleged and

incorporated by reference as if set out in full herein.

35.    From in or about May 2009, through in or about January 2010, in the District of

Columbia, and elsewhere, defendants,

AMARO GONCALVES, JEANA MUSHRIQUI, JOHN M. MUSHRIQUI,
DAVID PAINTER, LEE WARES, PANKESH PATEL, OFER PAZ,
WAYNE WEISLER, MICHAEL SACKS, JOHN WIER, HAIM GERI,
YOCHI COHEN, SAUL MISHKIN, R. PATRICK CALDWELL,
STEPHEN GIORDANELLA, ANDREW BIGELOW, HELMIE ASHIBLIE,
DANIEL ALVIREZ, LEE TOLLESON, GREG GODSEY, MARK MORALES, and
JONATHAN SPILLER,

and others known and unknown to the Grand Jury, did willfully, that is, with the intent to further

the objects of the conspiracy, and knowingly combine, conspire, and agree with each other and

with other persons, known and unknown to the Grand Jury, to commit offenses against the

United States in violation of Title 18 United States Code, Sections 1956 and 1957 as follows:

a.    to transport, transmit, and transfer a monetary instrument and funds from a
place in the United States to and through a place outside the United States,
with the intent to promote the carrying on of specified unlawful activity, in
violation of Title 18, United States Code, Section 1956(a)(2)(A);

b.    to conduct and attempt to conduct a financial transaction involving
property represented to be the proceeds of specified unlawful activity, or
property used to conduct or facilitate specified unlawful activity, with the
intent to promote the carrying on of specified unlawful activity, in
violation of Title 18, United States Code, Section 1956(a)(3)(A); and

c.    to knowingly engage in a monetary transaction by, through and to a
financial institution, affecting interstate and foreign commerce, in
criminally derived property of a value greater than $10,000, such property
having been derived from specified unlawful activity, in violation of Title
18, United States Code, Section 1957.

It is further alleged that the specified unlawful activity referred to above is a violation of the FCPA, Title 15, United States Code, Sections 78dd-1(a), 78dd-2(a), and 78dd-3(a).

**(Conspiracy to Commit Money Laundering, in violation of Title 18, United States Code, Section 1956(h))**

## FORFEITURE

36.     The violations alleged in Counts 1-43 of this Indictment are realleged and incorporated by reference herein for the purpose of alleging forfeiture to the United States of America pursuant to Title 18, United States Code, Sections 981 and 982(a)(1), and Title 28, United States Code, Section 2461(c).

37.     As a result of the conspiracy and substantive FCPA offenses alleged in Counts 1-43 of this Indictment (the "FCPA offenses"), the defendants,

> AMARO GONCALVES, JEANA MUSHRIQUI, JOHN M. MUSHRIQUI, DAVID PAINTER, LEE WARES, PANKESH PATEL, OFER PAZ, WAYNE WEISLER, MICHAEL SACKS, JOHN WIER, HAIM GERI, YOCHI COHEN, SAUL MISHKIN, R. PATRICK CALDWELL, STEPHEN GIORDANELLA, ANDREW BIGELOW, HELMIE ASHIBLIE, DANIEL ALVIREZ, LEE TOLLESON, GREG GODSEY, MARK MORALES, and JONATHAN SPILLER,

shall, upon conviction of such offenses, forfeit to the United States all property, real and personal, which constitutes or is derived from proceeds traceable to the FCPA offenses, wherever located, and in whatever name held, including, but not limited to a sum of money equal to the amount of proceeds obtained as a result of the FCPA offenses, in violation of Title 15, United States Code, Sections 78dd-1(a) and 78dd-2(a) and Title 18, United States Code, Section 371. By virtue of the offenses charged in Counts 1-43 of the Indictment, any and all interest that the defendants have in the property constituting, or derived from, proceeds obtained directly or indirectly, as a result of such offenses is vested in the United States and hereby forfeited to the United States pursuant to Title 18, United States Code, Section 981, in conjunction with Title 28, United States Code, Section 2461(c).

38.    As a result of the money laundering offense alleged in Count 44 of this

Indictment, the defendants,

AMARO GONCALVES, JEANA MUSHRIQUI, JOHN M. MUSHRIQUI,
DAVID PAINTER, LEE WARES, PANKESH PATEL, OFER PAZ,
WAYNE WEISLER, MICHAEL SACKS, JOHN WIER, HAIM GERI,
YOCHI COHEN, SAUL MISHKIN, R. PATRICK CALDWELL,
STEPHEN GIORDANELLA, ANDREW BIGELOW, HELMIE ASHIBLIE,
DANIEL ALVIREZ, LEE TOLLESON, GREG GODSEY, MARK MORALES, and
JONATHAN SPILLER,

shall forfeit to the United States any property, real or personal, involved in, or traceable to such

property involved in money laundering, in violation of Title 18, United States Code, Sections

1956 and 1957, including but not limited to the sum of money equal to the total amount of

property involved in, or traceable to property involved in those violations.  By virtue of the

commission of the felony offense charged in Count 44 of this Indictment, any and all interest that

the defendants have in the property involved in, or traceable to property involved in money

laundering is vested in the United States and hereby forfeited to the United States pursuant to

Title 18, United States Code, Section 982(a)(1).

39.    In the event that any property described above as being subject to forfeiture, as a

result of any act or omission by the defendants:

(a)  cannot be located upon the exercise of due diligence;

(b)  has been transferred or sold to or deposited with a third person;

(c)  has been placed beyond the jurisdiction of the Court;

(d)  has been substantially diminished in value; or

(e)  has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982, to seek

forfeiture of any other property of the defendants, up to the value of the above described property

in paragraph 39(a)-(e).

**(Forfeiture, Title 18, United States Code, Sections 981 and 982(a)(1), and Title 28, United States Code, Section 2461(c))**

A TRUE BILL


_____

FOREPERSON

32

DENIS J. MCINERNEY
Chief
Fraud Section, Criminal Division

By:    HANK BOND WALTHER
       Acting Deputy Chief
       LAURA N. PERKINS
       Trial Attorney
       JOEY LIPTON
       Trial Attorney


RONALD C. MACHEN JR.
United States Attorney
In and For the District of Columbia


By:    MATTHEW C. SOLOMON
       Assistant United States Attorney